**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| TERRELL RANDALL, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 17-cv-01707 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| KATHY KAMMERER, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

This case boils down to what happened during a prisoner's medical exam on December 2, 2015. Plaintiff Terrell Randall – an inmate at Stateville Correctional Center – submitted a sick call request and saw Defendant Kati Kammerer, a registered nurse working at the prison. The caregiver and the patient have different versions of what they discussed. Both of them come forward with evidence supporting their side of the story.

Nurse Kammerer says that Randall only had a cough, which she treated. But Randall's version is much more dire. He claims that he was vomiting blood and suffering from intense abdominal pain, which prevented him from eating or sleeping. He alleges that Nurse Kammerer was deliberately indifferent to his serious medical condition by ignoring his stomach problems and refusing his request to see a doctor.

Nurse Kammerer moved for summary judgment, but the record is chock-full of disputed questions about important facts. The two people in the exam room have different stories to tell about the treatment. They disagree about what Randall said, how serious his condition was, and whether Nurse Kammerer gave him proper care. The jury needs to sort out what happened and who to believe. For the reasons stated below, the motion for summary judgment is denied.

**Background**

Plaintiff Terrell Randall became an inmate at Stateville Correctional Center on May 22, 2015. *See* Pl.'s Resp. to Def.'s Rule 56.1 Statement of Facts, at ¶ 3 (Dckt. No. 117). In early December 2015, Randall became ill. *See* Pl.'s Rule 56.1 Statement of Additional Facts, at ¶ 1 (Dckt. No. 118). He claims that he suffered from abdominal pain, nausea, vomiting, and redness in his eyes. *Id.*

On or about December 2, Randall filed a written request to see a sick call nurse for a simple, down-to-earth reason: "I'm throwing up." *Id.* at ¶ 3. Later that day, he saw Defendant Kammerer, a registered nurse employed by Wexford Health Source, Inc. (the medical provider at the prison). *See id.* at ¶ 4; Pl.'s Resp. to Def.'s Rule 56.1 Statement of Facts, at ¶¶ 4, 14 (Dckt. No. 117).

Randall claims that Nurse Kammerer "knew of Plaintiff's written request when she treated Plaintiff during the sick call on December 2, 2015." *See* Pl.'s Rule 56.1 Statement of Additional Facts, at ¶ 3 (Dckt. No. 118). But the cited testimony leaves something to be desired. Nurse Kammerer testified that prisoners "would request to be seen on sick call. And their request is known. So you would – we'd have their chart in front of us." *See* Kammerer Dep., at 16:12–14 (Dckt. No. 107-2). Randall interprets the "request to be seen" to include the *reason* for the request. Maybe that's so, but it's not clear from the record, either. Still, it's a possible inference, and reasonable inferences flow in the non-movant's favor.

The parties disagree about what they discussed during the exam. Randall claims that he told Nurse Kammerer that he had been vomiting and coughing for a week. *See* Pl.'s Rule 56.1 Statement of Additional Facts, at ¶ 4 (Dckt. No. 118). Randall also described an intense pain in his throat, stomach, and chest that kept him from eating or sleeping. *Id.*

Nurse Kammerer denies hearing any such thing. *See* Def.'s Resp. to Pl.'s Rule 56.1 Statement of Additional Facts, at ¶ 4 (Dckt. No. 124). She doesn't remember treating Randall at all. *Id.* at ¶ 9; *see also* Pl.'s Resp. to Def.'s Rule 56.1 Statement of Facts, at ¶ 15 (Dckt. No. 117). Instead, she relies on her notes and her knowledge of Stateville's sick call process. *See, e.g.*, Def.'s Rule 56.1 Statement of Facts, at ¶¶ 7–13, 16, 24–26 (Dckt. No. 107).

Nurse Kammerer contends that Randall went to sick call for an incessant cough (only). *Id.* at ¶¶ 16–17. She knew that Randall had made a sick call request as evidenced by the visit itself. *See* Def.'s Resp. to Pl.'s Rule 56.1 Statement of Facts, at ¶ 3 (Dckt. No. 124). In fact, Plaintiff filled out multiple slips asking for a health care visit. *See* Randall Dep., at 39:12–21, 52:19–24 (Dckt. No. 107-1). Unfortunately, the sick call request slips aren't part of the record.

Instead, Nurse Kammerer points out that she used the jail's "cough" treatment protocol to record her notes of Randall's sick call visit and used the same protocol to treat him. *See* Def.'s Rule 56.1 Statement of Facts, at ¶ 17 (Dckt. No. 107). Protocols are typically indicative of the patient's primary complaint. *Id.* at ¶ 12. So if a patient comes into sick call complaining of a cough, the nurses use the cough protocol. *Id.* A protocol is not necessarily limiting, however. If a patient has multiple complaints – for example, coughing and vomiting – the nurse can either use multiple protocols related to specific conditions, or she can record all complaints on a single protocol. *Id.*

Nurse Kammerer's cough protocol for the December 2 visit contains no notes on vomiting. *See* IDOC Randall Med. Records (Dckt. No. 130). And there is no separate vomiting protocol in the record. But the use of the coughing protocol does not mean that there was no vomiting.

3

According to Nurse Kammerer's notes, Randall's overall condition looked relatively normal. After discussing his health complaints, Nurse Kammerer took his vital signs and examined his throat, nose, ears, and eyes, and listened to his lungs. *See* Pl.'s Resp. to Def.'s Rule 56.1 Statement of Facts, at ¶ 18 (Dckt. No. 117). She found Randall's vital signs to be within normal limits. *Id.* at ¶ 19. His throat and nose weren't red, his lungs were clear, and his skin was warm. *Id.* She assessed Randall with a "productive cough," so she followed the Illinois Department of Corrections medical protocol form for coughing. *See id.* at ¶¶ 17, 19. She gave him acetaminophen and CTM tablets. *Id.* at ¶ 20. Nurse Kammerer told Randall to drink more fluids and to return to sick call if he still felt sick in three days. *Id.*

Unhappy with this treatment plan, Randall filed a grievance later that day. *See* Pl.'s Rule 56.1 Statement of Additional Facts, at ¶ 5 (Dckt. No. 118). Randall complained that he told Nurse Kammerer about the pain in his chest, throat, and stomach. *See* Randall Grievance Report (Dckt. No. 118-2). He also claimed that he told her that he had been throwing up blood, and that he couldn't keep any food down. *Id.* With these symptoms, Randall believed that he should have received something more than a Tylenol. He wanted to see a doctor. *Id.*

Nurse Kammerer doesn't think that the grievance accurately reflects the sick call visit. She denies that Randall told her that he was vomiting blood, and denies that he asked to see a doctor. *See* Def.'s Rule 56.1 Statement of Facts, at ¶ 24 (Dckt. No. 107); Def.'s Resp. to Pl.'s Rule 56.1 Statement of Additional Facts, at ¶ 10 (Dckt. No. 124). Ultimately, a grievance officer reviewed and denied the grievance because Randall saw Nurse Kammerer the same day that he filed the grievance. *See* Def.'s Resp. to Pl.'s Rule 56.1 Statement of Additional Facts, at ¶ 5 (Dckt. No. 124); Randall Grievance Report, at 1, 5 (Dckt. No. 118-2) ("Offender was seen in Nurse sick call 12/2/15, protocol was followed.").

Nurse Kammerer told Randall to come back in three days if he still felt sick. *See* Pl.'s Resp. to Def.'s Rule 56.1 Statement of Facts, at ¶ 20 (Dckt. No. 117). A follow-up sick call visit was scheduled for December 5, 2015 (but the record does not reveal who scheduled it). *See* IDOC Randall Med. Records, at 3, 4 (Dckt. No. 130). The appointment time came and went, but Randall did not appear. *Id.* at 4.

The parties dispute why Randall was not there. Nurse Kammerer claims that Randall chose to go to the yard for recreational purposes instead of getting medical attention. *See* Def.'s Rule 56.1 Statement of Facts, at ¶ 29 (Dckt. No. 107). Randall disagrees. *See* Pl.'s Resp. to Def.'s Rule 56.1 Statement of Facts, at ¶ 29 (Dckt. No. 117); *see also* Randall Dep., at 59:24 – 60:5 (Dckt. No. 107-1). He claims that he was placed in segregation – otherwise known as solitary confinement – on December 4, which prevented him from attending. *See* Randall Dep., at 46:21–47:2, 47:10–12; 48:3–23 (Dckt. No. 107-1). It appears that Randall self-selected segregation. *See id.* at 48:3–13. Randall "walk[ed] [him]self to segregation" by telling the correctional officers that he wasn't going back to his cell until he saw a doctor. *Id.* at 48:3–7. The correctional officers handcuffed Randall and placed him in isolation. *Id.* at 48:10–13.

Randall missed his appointment on December 5, but he saw a different sick call nurse on December 6. *See* Pl.'s Rule 56.1 Statement of Additional Facts, at ¶ 7 (Dckt. No. 118). Randall claims – and Nurse Kammerer disputes – that he told this nurse "the same exact things that he told" Nurse Kammerer four days earlier. *Id.*; Def.'s Resp. to Pl.'s Rule 56.1 Statement of Additional Facts, at ¶ 7 (Dckt. No. 124). This time, the sick call nurse referred him to see a doctor. *See* Pl.'s Rule 56.1 Statement of Additional Facts, at ¶ 7 (Dckt. No. 118). Security constraints kept Randall from seeing a doctor until December 10. *Id.* Randall "experienced severe pain" while he waited. *Id.* at ¶ 8.

5

The doctor confirmed Randall's complaints. Dr. Saleh Obaisi noted that Randall suffered from abdominal pain, nausea, and vomiting. *See* Parties' Stipulations, at ¶ 4 (Dckt. No. 118-1). Dr. Obaisi diagnosed Randall with a peptic ulcer and conjunctivitis in both eyes. *Id.* He prescribed multiple medications to treat Randall's conditions. *Id.*

## Procedural Background

Randall filed this lawsuit in March 2017. *See* Cplt. (Dckt. No. 6). Court-appointed counsel filed an Amended Complaint in December 2017. *See* Am. Cplt. (Dckt. No. 16). In the Amended Complaint, Plaintiff named Nurse Kammerer and four other Illinois Department of Corrections employees. *Id.* at ¶¶ 4–9. In January 2019, Randall settled with the four other defendants. *See* Dckt. No. 95. Nurse Kammerer is the last remaining defendant.

## Summary Judgment Standard

Courts grant motions for summary judgment when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56. There is no need for a trial when the material facts are undisputed. To determine whether a genuine issue of fact exists, the Court must pierce the pleadings and assess the proof in the record. *Id.*; *see also* Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The party seeking summary judgment bears the initial burden of showing that there is no genuine issue of material fact. *Id.* at 323. In response, the non-moving party must come forward with evidence showing that there is a genuine issue for trial. *Id.* at 324; *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). A bare-bones contention that an issue of fact exists is insufficient to create a factual dispute. *Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000). But in deciding whether a genuine and material fact issue exists, the Court reviews the

6

facts and inferences to be drawn from them in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## Discussion

The Eighth Amendment protects inmates from a governmental actor's deliberate indifference to serious threats to prisoners' health and safety. *See Daniel v. Cook County*, 833 F.3d 728, 733 (7th Cir. 2016); *see also Farmer v. Brennan*, 511 U.S. 825, 828–29 (1994); *King v. Kramer*, 680 F.3d 1013, 1020 (7th Cir. 2012); *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). While not every claim about inadequate medical treatment is a constitutional violation, "the Eighth Amendment safeguards the prisoner against a lack of medical care that 'may result in pain and suffering which no one suggests would serve any penological purpose.'" *Petties v. Carter*, 836 F.3d 722, 727 (7th Cir. 2016) (quoting *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)).

To defeat Defendant's motion for summary judgment on his deliberate indifference claim, Randall "must satisfy both an objective and subjective element." *King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012). First, Randall must show that he suffered from an "objectively serious medical need." *Id.* "An objectively serious medical condition is one that 'a physician has diagnosed as needing treatment' or that is so obviously serious 'that even a lay person would easily recognize the necessity of a doctor's treatment.'" *McDonald v. Hardy*, 821 F.3d 882, 889 (7th Cir. 2016) (quoting *Knight v. Wiseman*, 590 F.3d 458, 463 (7th Cir. 2009)).

Second, Randall "must also demonstrate a genuine issue of fact on the question whether the nurse[] . . . [was] aware of this serious medical need and [was] deliberately indifferent to it." *King*, 680 F.3d at 1018. In other words, Randall must show that Nurse Kammerer knew about the serious medical condition and disregarded it. *See Farmer*, 511 U.S. at 837. This is the subjective element: "[t]he defendant must know of facts from which [s]he could infer that a substantial risk of serious harm exists, and [s]he must actually draw the inference." *Whiting v.*

7

*Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016). Deliberate indifference means something more than negligence, or even gross negligence. *Id.*; *see also King*, 680 F.3d at 1018. Even medical malpractice falls short of the deliberate indifference standard. *See Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011). "The standard is comparable to that required for criminal recklessness." *King*, 680 F.3d at 1018.

The parties dispute both the objective and subjective prongs of deliberate indifference, so the Court will address both elements.

I.  **Objectively Serious Medical Condition**

Randall has met his burden of presenting sufficient evidence to support a finding that he had a serious medical condition. Randall comes forward with evidence that Nurse Kammerer's notes and assessment in his medical record are inaccurate. He testified that he told Nurse Kammerer about his abdominal pain and his frequent vomiting. *See* Pl.'s Rule 56.1 Statement of Additional Facts, at ¶ 4 (Dckt. No. 118). His grievance mentions the vomiting, too. *Id.* at ¶ 5.

He also submits evidence that he was unable to attend his follow-up appointment on December 4 because he was in segregation, not because he felt well enough to skip the appointment and go to the yard. *See* Randall Dep., at 47:10–12; 48:3–23; 59:24–60:5 (Dckt. No. 107-1). Finally, he testified that four days after he saw Nurse Kammerer, a different nurse *did* refer him to a doctor. *See* Pl.'s Rule 56.1 Statement of Additional Facts, at ¶ 7 (Dckt. No. 118). That doctor diagnosed him and prescribed treatments for multiple conditions, including a peptic ulcer and conjunctivitis. *See* Parties' Stipulations, at ¶ 4 (Dckt. No. 118-1).

The Seventh Circuit has found that frequent vomiting is an objectively serious medical need. *See Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005) ("[A] lay person would recognize the need for a doctor's care to treat . . . frequent vomiting."). The same goes for intense

8

abdominal pain. *See Miller v. Campanella*, 794 F.3d 878, 880 (7th Cir. 2015). "A medical condition need not be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated." *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010).

And, as noted above, a doctor diagnosed Randall's condition as requiring treatment – an indicator of an objectively serious medical condition. *See McDonald v. Hardy*, 821 F.3d 882, 889 (7th Cir. 2016). When Randall saw Dr. Obaisi on December 10, he diagnosed Randall with conjunctivitis and a peptic ulcer. He ultimately prescribed Keflex, Bentyl, and Zantac, as well as eye drops. *See* Parties' Stipulations, at ¶ 4 (Dckt. No. 118-1). And if that weren't enough, a lay person could readily find that Randall's symptoms – repeated vomiting, intense abdominal pain, an inability to eat or sleep, and red-tinged eyes – required medical treatment, thus qualifying them as objectively serious. *See Roe v. Elyea*, 631 F.3d 843, 861–62 (7th Cir. 2011) (noting that the Seventh Circuit's "cases demonstrate that a broad range of medical conditions may be sufficient to meet the objective prong of a deliberate indifference claim.").

Randall "may be exaggerating, but that is a matter for resolution at a trial." *Miller*, 794 F.3d at 880. For now, Randall has met his burden of presenting evidence that could support a finding of an objectively serious medical condition.

## II.     Subjective Knowledge and Disregard of a Serious Medical Condition

Randall also comes forward with evidence that could support a finding by a reasonable jury that Nurse Kammerer was deliberately indifferent to his medical condition. Maybe the jury won't see it that way, but that is a question for another day.

Whether a prison official acted with deliberate indifference depends on her subjective state of mind. *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016). While a plaintiff does not

9

need to show that the official intended harm, he must "provide evidence that an official *actually* knew of and disregarded a substantial risk of harm." *Id.* (emphasis in original). To carry their burden, plaintiffs usually rely on circumstantial evidence, rather than direct evidence. "Rarely if ever will an official declare, 'I knew this would probably harm you, and I did it anyway!'" *Id.*

A medical professional's deliberate indifference can be inferred when her treatment decision is "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that [she] did not base the decision on such a judgment." *King v. Kramer*, 680 F.3d 1018, 1018–19 (7th Cir. 2012) (quoting *Estate of Cole by Pardue v. Fromm*, 94 F.3d 254, 261–62 (7th Cir. 1996)). In other words, "[a] medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have so responded under those circumstances." *Sain v. Wood*, 512 F.3d 886, 894–95 (7th Cir. 2008) (internal quotation marks omitted). When determining whether a care provider's choices rise to the level of deliberate indifference, the Court must look at the totality of an inmate's medical care. *See Petties*, 836 F.3d at 728.

The Seventh Circuit has identified several circumstances sufficient to show deliberate indifference. In the most obvious case, a medical official chooses to ignore a request for medical attention. *Id.* at 729. But a plaintiff need not show that he was "literally ignored." *Id.*; *Conley v. Birch*, 796 F.3d 742, 748 (7th Cir. 2015). "If a risk from a particular course of medical treatment (or lack thereof) is obvious enough, a factfinder can infer that a prison official knew about it and disregarded it." *Id.* Similarly, deliberate indifference may be found if the course of treatment is "so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate the prisoner's condition." *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996) (quoting *Thomas v. Pate*, 493 F.2d 151, 158 (7th Cir. 1974)).

10

There is a genuine dispute of material fact about whether Nurse Kammerer actually knew of Randall's serious medical condition and disregarded it. The issue boils down to whether she knew about his vomiting and failed to treat it.

If Randall only had a cough, he would not get to a jury. According to Nurse Kammerer's notes, Randall merely had an incessant cough. *See* Pl.'s Resp. to Def.'s Rule 56.1 Statement of Facts, at ¶¶ 16–17 (Dckt. No. 117). If it was just a cough, she wasn't deliberately indifferent: she treated the cough, and the treatment was adequate. There is no evidence that the treatment of his cough was "such a substantial departure from accepted professional judgment" to constitute deliberate indifference. *See Petties*, 836 F.3d at 729. No reasonable jury could infer that Nurse Kammerer ignored his cough or treated it in an manner that was out of bounds.

But Randall presents evidence that he complained about a wider range of medical problems, including a week of vomiting. He told Nurse Kammerer about his days of vomiting and abdominal pain that kept him from eating or sleeping. *See* Pl.'s Rule 56.1 Statement of Additional Facts, at ¶¶ 4–5 (Dckt. No. 118); Randall Grievance Report, at 3 (Dckt. No. 118-2). If his version of the facts is true, a reasonable jury could find that Nurse Kammerer's decision to treat a cough – and her failure to treat his vomiting – created an obvious risk of harm. Ignoring a week of vomiting could support a finding that Defendant Kammerer was deliberately indifferent to Randall's medical needs.

The issue is what, if anything, Randall told Nurse Kammerer about his vomiting. There is admissible evidence on both side of the scale, and it is the job of the jury – not this Court – to weigh the evidence. A finding of deliberate indifference here turns on a credibility determination about who to believe. "There is evidence pointing in both directions, and while a

jury might draw inferences favorable to [Randall], the record also permits the opposite inferences." *See Conley v. Birch*, 796 F.3d 742, 748 (7th Cir. 2015).

Maybe the jury will believe Nurse Kammerer. Right now, the point is not that Randall's story is more believable than Nurse Kammerer's story. The point is simply that a jury must sort it out. For that reason, this Court denies the summary judgment motion on this claim.

Nurse Kammerer contends that Randall's only complaint in this case is that she delayed medical assistance by not referring him to a doctor. *See* Def.'s Rule 56.1 Statement of Facts, at ¶ 21 (Dckt. No. 107); Def.'s Mem. of Law in Support of Summ. Judgment, at 7–8 (Dckt. No. 108). She believes that Randall "complains that prison officials delayed, rather than denied, medical assistance." Def.'s Mem. of Law in Support of Summ. Judgment, at 7 (Dckt. No. 108).

But Randall isn't claiming that Nurse Kammerer merely delayed treatment. He doesn't allege that she should have treated him for vomiting at Time X but waited until Time Y. Instead, he claims that she never treated his vomiting *at all*. Another medical professional treated his vomiting later. So, Randall claims that Nurse Kammerer is liable for the pain that he experienced in the meantime.

### III. Randall's Exhaustion of Administrative Remedies

Nurse Kammerer briefly argues that Randall failed to exhaust his administrative remedies as required under 42 U.S.C. § 1997e(a). *See* Def.'s Mem. of Law in Support of Summ. Judgment, at 9 (Dckt. No. 108). Section 1997e(a) states that "[n]o action shall be brought with respect to prison conditions . . . until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). By exhausting a prison's internal grievance process, the inmate gives prison officials an opportunity to resolve the issue. *See Jones v. Bock*, 549 U.S. 199, 219 (2007); *Woodford v. Ngo*, 548 U.S. 81, 95 (2006).

"Procedurally speaking, the Seventh Circuit has instructed the district courts in this circuit that as a matter of best practices, the issue of exhaustion should be resolved at the start of the case, before pretrial discovery begins." *Bruce v. Ghosh*, 2015 WL 1727318, at *4 (N.D. Ill. 2015) (citing *Pavey v. Conley*, 544 F.3d 739, 742 (7th Cir. 2008)). The Court resolves exhaustion issues through a *Pavey* hearing. *Id.* Nurse Kammerer raised exhaustion as an affirmative defense (*see* Answer, at 11–12 (Dckt. No. 48)), but she did not inform the Court that she intended to pursue an exhaustion argument before filing her summary judgment motion.

Given *Pavey's* holding that "exhaustion is not a question for the jury at trial," the Court is left with two options. *See Wagoner v. Lemmon*, 778 F.3d 586, 592 (7th Cir. 2015). The Court can deny the motion for summary judgment without prejudice and conduct a *Pavey* hearing. *Id.* at 588. Or, "if the court can resolve the question of exhaustion based on the . . . documentary evidence, it renders a hearing unnecessary." *Nessbitt v. Villanueva*, 2011 WL 737617, at *3 (N.D. Ill. 2011). The Court will look at the evidence in the record to determine if a *Pavey* hearing is necessary.

"Because Stateville is an Illinois Department of Corrections facility, its grievance procedure is governed by Illinois's Administrative Code." *Lewis v. Pfister*, 2019 WL 5577164, at *1 (N.D. Ill. 2019); 20 Ill. Admin. Code § 504.800. To meet the exhaustion requirement, Randall had to take all steps required by Stateville's grievance system. *See Ford v. Johnson*, 362 F.3d 395, 397 (7th Cir. 2004).

Stateville's grievance procedure requires inmates to overcome multiple hurdles. First, the inmate must file his grievance with a grievance counselor within 60 days of the incident. *See* 20 Ill. Admin. Code § 504.810(a). The grievance must "contain factual details regarding each aspect of the offender's complaint, including what happened, when, where and the name of each

13

person who is the subject of or who is otherwise involved in the complaint." *Id.* at § 504.810(c). If there is a "substantial risk of imminent personal injury," the inmate may request that his grievance be handled on an emergency basis. *Id.* at § 504.840(a). The Chief Administrative Officer determines if the grievance requires emergency handling. *Id.* at § 504.840(c). If he doesn't find an exigency, he notifies the prisoner to resubmit the grievance through the normal channels. *Id.*

Once the grievance counselor receives the complaint, she reviews it and provides the inmate with a written response. *Id.* at § 504.830(a). The grievance officer also sends her recommendations to the Chief Administrative Officer. *Id.* at § 504.830(e). The Chief Administrative Officer reviews the counselor's findings and informs the inmate if the grievance is granted or denied. *Id.* "If . . . the offender still believes that the problem . . . has not been resolved to his or her satisfaction, he or she *may* appeal in writing to the Director." *Id.* at § 504.850 (emphasis added).

Randall submitted his grievance and the grievance response as evidence for summary judgment. *See* Randall Grievance Report (Dckt. No. 118-2). In his grievance, Randall described his sick call visit with Nurse Kammerer, which happened that same day. *Id.* at 3–4. He wrote that he told her about his abdominal pain, that he was throwing up blood, and that he couldn't eat or sleep. *Id.* at 3. He complained that Nurse Kammerer would not let him see a doctor. *Id.* at 4.

Randall initially filed an emergency grievance, but the Chief Administrative Officer determined that "an emergency [was] not substantiated." *Id.* at 3. So Randall went through the normal channels of review. A grievance counselor responded to the grievance on January 14,

14

2016.[1]  *Id.* at 5.  She found that Nurse Kammerer had followed the proper protocol.  *Id.*  The Chief Administrative Officer concurred in that finding about a week later.  *Id.* at 1.

Randall chose not to appeal.  *See id.*  In many cases, the failure to appeal a grievance means that the plaintiff failed to exhaust his administrative remedies.  *See Turley v. Rednour*, 729 F.3d 645, 649 (7th Cir. 2013) ("In Illinois, the last level of appeal for a prisoner pursuing a grievance is a final determination by the Director."); *see also* 20 Ill. Admin. Code § 504.850(a) – (f).  Not so here.  "The requirement to exhaust all available remedies requires that *some* remedy is available to an inmate through the administrative process."  *Thorton v. Snyder*, 428 F.3d 690, 695 (7th Cir. 2005) (cleaned up).  If the inmate no longer suffers from the problem in the grievance, "then there is no administrative remedy to exhaust."  *Id.* (cleaned up).

For example, the Seventh Circuit observed that a hypothetical inmate complaining of a delay in treatment for a broken leg would have no administrative remedy available once his leg healed.  *See Perez v. Wisc. Dep't of Corr.*, 182 F.3d 532, 538 (7th Cir. 1999).  That is essentially what happened here.  By the time Randall received the Chief Administrative Officer's response on January 20, 2016, he had received treatment from Dr. Obaisi.  *See id.*; Parties' Stipulations, at ¶ 4 (Dckt. No. 118-1).  Fortunately, that visit with Dr. Obaisi and his treatment regime alleviated the ailment that Randall raised in his grievance.  Simply put, he was no longer vomiting, so he needed no additional treatment for that ailment.  "Once a prisoner has won all the relief that is available under the institution's administrative procedures, his administrative remedies are exhausted."  *Thorton*, 428 F.3d at 695–96 (quoting *Ross v. County of Bernalillo*, 365 F.3d 1181, 1187 (10th Cir. 2004)).

---

[1] The grievance counselor's response form incorrectly dates the reply as "01/14/15."  *See* Randall Grievance Report, at 5 (Dckt. No. 118-2).  Presumably, this is a typographical error.  It should be 2016.

15

Nurse Kammerer doesn't address an important fact in her reply: Randall was already on the mend, thanks to Dr. Obaisi. *See* Def.'s Reply (Dckt. No. 123). In fact, she appears to drop her exhaustion argument in its entirety. *See id.* Nurse Kammerer bears the burden of proving failure to exhaust as an affirmative defense. *Hernandez v. Dart*, 814 F.3d 836, 840 (7th Cir. 2016); *Hebron v. Baldwin*, 2020 WL 757900, at *1 (N.D. Ill. 2020). Based on the record, Randall did not need do more to exhaust his administrative remedies before bringing suit here.

## Conclusion

This case boils down to a "he said, she said" that precludes summary judgment. The parties have marshalled evidence on each side, and Randall has presented a story "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The jury will decide what was said in the exam room. Defendant's Motion for Summary Judgment is denied.

Date: April 16, 2020

Steven C. Seeger
United States District Judge